Timothy Kingston (WY Bar No. 5-2476)
LAW OFFICE OF TIM KINGSTON, LLC
620 East 27th
Cheyenne, WY 82001
TEL: (307) 638-8885
FAX: (307) 637-4850

William S. Eubanks II (D.C. Bar No. 987036, *pro hac vice* submitted)
MEYER GLITZENSTEIN & EUBANKS LLP
245 Cajetan Street
Fort Collins, CO 80524
(970) 703-6060 / (202) 588-5049 (fax)
beubanks@meyerglitz.com

William N. Lawton (Oregon Bar No. 143685, *pro hac vice* submitted)
MEYER GLITZENSTEIN & EUBANKS LLP
4115 Wisconsin Ave, NW, Suite 210
Washington DC, 20016
(202) 588-5206 / (202) 588-5049 (fax)
nlawton@meyerglitz.com

Counsel for Petitioners

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AMERICAN WILD HORSE PRESERVATION CAMPAIGN<br>P.O. Box 1048<br>Hillsborough, NC 27278, | ) ) ) ) ) |
| THE CLOUD FOUNDATION<br>107 South 7th Street<br>Colorado Springs, CO 80905, | ) ) ) ) |
| RETURN TO FREEDOM<br>P.O. Box 926<br>Lompoc, CA 93438, | ) ) ) ) |
| CAROL WALKER<br>16500 N. Dakota Ridge Rd.<br>Longmont, CO 80503, | ) ) ) ) |

GINGER KATHRENS )
107 South 7th Street )
Colorado Springs, CO 80905, )
)
KIMERLEE CURYL )
P.O. Box 1802 )                                    Civ. No. 16-cv-246-F
Santa Ynez, CA 93460 )
)
                Petitioners, )
)
        v. )
)
SALLY JEWELL, Secretary )
Department of the Interior )
1849 C Street, N.W. )
Washington, DC 20240, )
)
NEIL KORNZE, Acting Director )
Bureau of Land Management )
1849 C Street, N.W. )
Washington, DC 20240, )
)
                Respondents. )

## PETITION FOR REVIEW

1.      This case challenges a September 16, 2016 Decision Record ("2016 Decision

Record") issued by the Bureau of Land Management ("BLM"), purporting to take action

pursuant only to BLM's limited Section 4 authority under the Wild Free-Roaming Horses and

Burros Act ("Wild Horse Act" or "WHA"), 16 U.S.C. § 1334, which Congress explicitly limited

in application to *private* lands, to once again permanently remove *all* federally protected wild

horses from the *public* and private Wyoming Checkerboard lands within the Adobe Town, Salt

Wells Creek, and Great Divide Basin Herd Management Areas ("HMA"). Plaintiffs have

requested that Defendants postpone implementation of this decision pending resolution of the

fully briefed appeal in pending in the U.S. Court of Appeals for the Tenth Circuit on this same

2

issue in appeal number 15-8033, but the government has refused to do so. Approximately half of these Checkerboard lands are *public* lands managed by BLM specifically for long-term use by and management of wild horses. Yet, BLM has authorized the *permanent* removal of hundreds of federally protected wild horses from these public lands—lands that are currently allocated in binding resource management plans ("RMP") for wild horse use and management—without even purporting to comply with the statutory prerequisites in Section 3 of the Act that Congress directed must be satisfied before a single wild horse may be removed from any public land allocated to wild horse use and management, whether or not BLM may also separately need to address wild horse issues pertaining to adjacent private lands.

      2.      BLM violated the Wild Horse Act by authorizing the *permanent* removal of wild horses from *public* land without making the statutorily required determination that: (a) there is an overpopulation of wild horses in the public lands of the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs, and (b) action is necessary to remove those wild horses determined by the agency to constitute "excess" animals, as explicitly required by Section 3 of the Act. 16 U.S.C. § 1333(b)(2). Congress explicitly defined "public lands" as used in the Wild Horse Act to mean "*any* lands administered by the Secretary of the Interior through the Bureau of Land Management," 16 U.S.C. 1332(e) (emphasis added), which necessarily includes all public lands of the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs, whether located in the Checkerboard or outside of it. Thus, because BLM admits in its 2016 Decision Record that at least half of the horses subject to permanent removal are currently found on *public* land, BLM's failure to make any of the Congressionally mandated determinations in Section 3 before

3

permanently removing from the range approximately 500 wild horses is a violation of the Wild Horse Act and the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2).

3.    Compounding BLM's Wild Horse Act violations, according to the agency's own census estimates, BLM's permanent removal of approximately 500 wild horses from the Checkerboard lands in Wyoming will likely bring the wild horse populations in the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs below the low appropriate management level ("AML") for the public lands of these HMAs, which violates the requirements of the Wild Horse Act. *See* 16 U.S.C. § 1333(b)(1). In addition, BLM has established binding RMPs for each of these HMAs that require the agency to maintain the wild horse populations in these public lands within their respective and legally enforceable AMLs. By completely ignoring these governing RMPs and the binding AMLs found therein, BLM's decision is arbitrary and capricious and not in accordance with the Wild Horse Act or the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, within the meaning of the APA.

4.    BLM authorized the removal of all wild horses from the Checkerboard lands within the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs on the basis of an Environmental Assessment ("EA") prepared under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m. However, in its Final EA, BLM refused to consider all reasonable alternatives as required by NEPA and its implementing regulations. For example, BLM deliberately ignored repeated public comments requesting that BLM consider, as an obvious alternative to permanently removing all wild horses from the Checkerboard's public and private lands in derogation of Section 3 of the Wild Horse Act and the binding AMLs, an approach that would harmonize these statutory provisions by removing all wild horses from the

4

Checkerboard portions of these HMAs pursuant to both Sections 3 and 4 of the Wild Horse Act and retuning to the solid public land blocks of these HMAs the minimum number of horses necessary to achieve the low AML in each HMA.  Not only did public commenters request consideration and detailed analysis of this reasonable alternative, but this Court previously directed BLM to consider in future NEPA analyses management approaches for the Checkerboard in which BLM may return some horses to the solid public blocks of these HMAs. BLM's failure to analyze this alternative in detail violations NEPA, its implementing regulations, and the APA.

**JURISDICTION**

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

**PARTIES**

6.      Petitioner American Wild Horse Preservation Campaign ("AWHPC") is a national wild horse advocacy organization whose grassroots mission is endorsed by a coalition of more than sixty horse advocacy, public interest, and conservation organizations.  Supporters of AWHPC and partner coalition organizations enjoy viewing wild horses on public lands, including in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs, for observation, photography, and educational purposes.  On behalf of its supporters, AWHPC also regularly submits comments on various BLM actions related to the management of wild horses, such as decisions analyzing and authorizing removal of wild horses from the range.

7.      BLM's decision to remove hundreds of wild horses from the public Checkerboard lands, including removing so many horses that it will likely bring the wild horse populations in the public lands of these HMAs below the operative AMLs, directly harms AWHPC's

organizational interests and the interests of its coalition partners and supporters in protecting and preserving viable free-roaming herds of wild horses on public lands, and their aesthetic interests in observing and photographing wild horses engaging in their natural behaviors on these particular public lands. BLM's failure to make an "excess" determination under the Wild Horse Act subject to public comment, coupled with BLM's refusal to consider in its EA an alternative repeatedly urged by AWHPC in its public comments on this decision, adversely affects AWHPC and its supporters by depriving them of information related to the environmental effects of the permanent removal of hundreds of wild horses from the public Checkerboard lands.

8. A court order enjoining BLM from rounding up, removing, and otherwise harassing these wild horses will protect AWHPC's interests and those of its supporters and coalition partners in the welfare and continued existence of viable free-roaming herds of wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs, and allow AWHPC and its supporters to be able to observe and otherwise enjoy the wild horse herds on these public lands, including in the Checkerboard. Requiring BLM to conduct a lawfully appropriate environmental analysis—including consideration of all reasonable alternatives—prior to deciding whether to permanently remove wild horses from the Checkerboard lands would also provide AWHPC, as well as its coalition partners and supporters, with crucial information concerning the potential environmental ramifications of such action and would afford AWHPC with the opportunity to meaningfully participate in BLM's decisionmaking process.

9. Petitioner the Cloud Foundation ("TCF" or "the Foundation") is a 501(c)(3) nonprofit organization headquartered in Colorado Springs, Colorado. TCF is dedicated to the preservation of wild horses on public lands in the western United States, including in the Great

6

Divide Basin, Adobe Town, and Salt Wells Creek HMAs. Members of TCF enjoy viewing, studying, photographing, and filming wild horses in their natural habitats, free from human interference, and they regularly travel to various areas, including the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs (including the Checkerboard), specifically for the purpose of viewing wild horses. BLM's decision authorizing the permanent removal of wild horses from these areas harms TCF's organizational interest, as well as the interest of its members, in preserving free-roaming wild horses on the public portions of the Checkerboard lands, in addition to their aesthetic interests in observing, studying, and photographing wild horses on the range.

10.      A court order enjoining BLM from rounding up, removing, and otherwise harassing these wild horses will protect TCF's and its members' interests in the welfare and continued existence of viable free-roaming herds of wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs within the AMLs set forth in binding RMPs that apply to these public lands, and will allow TCF to devote its resources to other wild horse conservation programs.

11.      Petitioner Return to Freedom ("RTF") is a national wild horse preservation, education and sanctuary organization. RTF's American Wild Horse Sanctuary in Lompoc, California began relocating intact bands of wild horses directly from the range to the sanctuary nearly two decades ago. Since 1997, RTF has provided leadership to help define a viable direction for the preservation of America's wild horses with the understanding of their natural social behaviors and needs for long-term genetic viability and social well-being. RTF has pioneered the implementation of solution-based, non-intrusive wild horse management methods

7

at its sanctuary, such as the use of Porcine Zona Pellucida ("PZP"), a non-hormonal birth control method that preserves the wild horses' natural behavior, and advocates for BLM to apply these minimally invasive management methods on the range. RTF's supporters also enjoy observing and photographing wild horses on public lands, including in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs (including the Checkerboard lands). BLM's decision authorizing the permanent removal of wild horses from the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs harms RTF's organizational interest, as well as the interests of its members, in using minimally invasive methods to manage wild horses on the range in order to preserve their natural social behaviors. The permanent removal of horses from these areas also harms the aesthetic and recreational interests of RTF's supporters in observing and photographing these animals on the range.

12.    A court order enjoining BLM from permanently removing wild horses from the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs will protect RTF's and its members' interests in managing these wild horses on the range by preventing the unnecessary removal of wild horses below the AMLs for these areas.

13.    Petitioner Carol Walker is a photographer with professional and personal interests in the wild horse herds in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs. She is also a board member of the Wild Horse Freedom Federation, a nonprofit organization dedicated to preventing wild equine extinction. She has spent her career photographing wild horses, particularly horses exhibiting wild and natural behaviors on the range. She sells fine art prints, calendars, and books of her photographs of wild horses engaging in their natural behaviors. Ms. Walker has visited the wild horses in the Great Divide Basin, Adobe Town, and

8

Salt Wells Creek HMAs several times a year since 2004. Most recently, she visited the Adobe Town HMA in July 2016, the Salt Wells Creek HMA in July 2016, and the Great Divide Basin HMA in July 2016. She also visited the Rock Springs Corrals—where BLM is holding wild horses removed from these HMAs in 2014—in July 2016. She has concrete plans to regularly return to observe the wild horses in these HMAs (including in the Checkerboard), both for her personal aesthetic interests in observing the wild horses and to pursue her professional and economic interests in photographing these animals. A book of Ms. Walker's photographs was published in France in 2014, titled *Mustang: The Heart of an American Legend*, which includes photographs taken in these three HMAs.

14.    BLM's proposed actions will seriously impair Ms. Walker's aesthetic, recreational, economic, and occupational interests in observing and photographing wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs. BLM's authorization of the removal of *all* wild horses from the Checkerboard lands—which is approximately 500 wild horses that currently reside in these HMAs—will dramatically reduce her ability to observe and photograph wild horses in these HMAs, because there will be far fewer wild horses remaining after BLM implements its permanent removal, which will leave even fewer horses in the Adobe Town, Salt Wells Creek, and Great Divide Basin HMAs than required by the governing RMPs. A court order enjoining BLM from rounding up, removing, and otherwise harassing these wild horses will redress the many personal and professional harms that this decision will cause Ms. Walker, and in the process protect Ms. Walker's ability to enjoy, photograph, and study these horses on the range.

9

15.     Petitioner Kimerlee Curyl is a photographer with a professional and personal interest in the wild horse herds in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs. She has spent her career photographing wild horses in hopes of inspiring others to preserve their place on the range. She sells fine art prints of wild horses and has exhibited her photographs in galleries across the country. Her work has also been used in advertising and product branding campaigns. In addition, she taught an equine photography workshop in June 2014 at RTF's sanctuary in California dedicated to preserving intact wild horse families (referred to as "bands"). Ms. Curyl has visited the wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs (including the Checkerboard) several times, most recently in June 2016. She has concrete plans to regularly return to observe the wild horses in these HMAs, both for her personal aesthetic and recreational interests in observing the wild horses and to pursue her professional interest in photographing these animals.

16.     BLM's decision impairs Ms. Curyl's aesthetic, recreational, economic, and occupational interests in observing and photographing wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs (including in the Checkerboard). BLM's authorization of the removal of all wild horses from the Checkerboard lands will dramatically reduce her ability to photograph wild horses in these HMAs, because there will be far fewer wild horses once BLM permanently removes them from these HMAs in numbers that will result in these areas dropping below the prescribed AMLs, making it far less likely Ms. Curyl will be able to observe and photograph wild horses on the public land in these areas. A court order enjoining BLM from rounding up, removing, and otherwise harassing these wild horses will redress the

harms caused to Ms. Curyl by this decision, and in the process will protect Ms. Curyl's ability to enjoy, photograph, and study these horses in their natural habitat.

17.    Petitioner Ginger Kathrens is the founder and Executive Director of Petitioner TCF.  Since 1994 Ms. Kathrens has been studying, photographing, and filming wild horses in all ten western states as well as on Cumberland Island, Georgia. She has directed and produced three award-winning films that chronicle the life of Cloud, a pale palomino wild horse stallion and TCF's namesake, which air on PBS's Nature series.  Ms. Kathrens has also authored three natural history books about Cloud, as well as dozens of articles about wild horses.  She speaks throughout the United States about her experiences in the wild and the plight of wild horses on public lands in the West.  Ms. Kathrens has visited the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs (including the Checkerboard) several times for various personal and professional purposes, including photographing the horses and observing roundups.  Ms. Kathrens visited the Salt Wells and Great Divide Basin HMAs as recently as January 2014 and has concrete plans to visit all three of the HMAs at issue in the next twelve months to observe and photograph the horses there.

18.    BLM's decision authorizing the permanent removal of wild horses from the Checkerboard lands will impair Ms. Kathrens' aesthetic and professional interests in studying, photographing, and filming wild horses in the Great Divide Basin, Adobe Town, and Salt Wells Creek HMAs.  BLM's decision runs directly counter to Ms. Kathrens' personal and professional goals of preserving wild horses on the range in the West by removing these animals permanently from their natural habitat in numbers that will result in the wild horse populations in these HMAs dropping below the applicable AMLs.  BLM's decision will also greatly reduce Ms. Kathrens'

11

ability to photograph and observe wild horses on the public land in these areas. Accordingly, a

court order enjoining BLM from rounding up, removing, and otherwise harassing these wild

horses will redress the myriad harms caused to Ms. Kathrens by BLM's decision, and in the

process protect Ms. Kathrens' ability to enjoy, photograph, write about, film, and study these

horses on the range.

      19.     Defendant Sally Jewell is the Secretary of the Department of the Interior, the

parent agency of BLM, and, accordingly, is ultimately responsible for the decision challenged

here.

      20.     Defendant Neil Kornze is the Director of BLM, which is the agency that made the

decision at issue, and therefore is also responsible for the decision at issue.

STATUTORY AND REGULATORY FRAMEWORK

**A.**     **The Wild Free-Roaming Horses and Burros Act**

      21.     Congress enacted the Wild Horse Act in 1971 out of concern that wild horses

were quickly "disappearing from the American scene." 16 U.S.C. § 1331. Congress declared

that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of

the West" and that "they contribute to the diversity of life forms within the Nation and enrich the

lives of the American people." *Id.* As a result, by enacting the Wild Horse Act, Congress sought

to guarantee that "wild free-roaming horses and burros *shall be protected* from capture,

branding, harassment, [and] death," and "be considered in the area where presently found, as an

*integral part of the natural system of the public lands*." *Id.* (emphasis added). To implement that

mandate, Congress required that BLM "shall manage wild free-roaming horses and burros as

12

*components of the public lands*," and provided that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a) (emphasis added).

22.     BLM manages wild horses on public lands within certain types of management areas, one of which is a herd management area ("HMA"). An HMA is "established for the maintenance of wild horse and burro herds," 43 C.F.R. § 4710.3-1, based on the geographic areas that were used by these animals in 1971 when the Wild Horse Act was enacted or as amended by BLM since that time in RMPs. 43 C.F.R. § 4700.0-5(d).

23.     BLM may only designate an HMA through the land-use planning process conducted pursuant to FLPMA. FLPMA's implementing regulations require BLM to periodically develop, revise, and maintain RMPs, which are written documents—adopted only after extensive public comment—that are "designed to guide and control future management actions." 43 C.F.R. § 1601.0-2. Modifications to HMAs, including alterations to an HMA's boundaries, may only be adopted through this land-use planning process, which requires public notice and comment. *See* 43 C.F.R. § 4710.1; BLM, Wild Horses and Burros Management Handbook H-4700-1, Rel. 4-116, at 7-8 (June 2010) ("BLM Handbook") (explaining that decisions to "designate HMAs for the maintenance of WH&B, or to remove all or a portion of an area's designation as an HMA must be made through a [land use plan] amendment, revision or new RMP").

24.     The Wild Horse Act requires BLM to "manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). In accordance with this mandate, for each HMA, the Secretary must: (1) maintain a current

13

inventory of wild horses in the management area, (2) "determine [the] appropriate management level" ("AML") of wild horses that the HMA can sustain, and (3) determine the method of achieving the designated AML and managing horses within that AML. 16 U.S.C. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1; *see* BLM, Wild Free-Roaming Horses and Burros Management Manual ("BLM Manual") 4710.45 (procedures for conducting population inventories.).

25.    An AML is "expressed as a population range within which [wild horses] can be managed for the long term" in a given HMA without resulting in rangeland damage. *See* BLM Handbook at 17. The upper limit of the AML is "the maximum number" of wild horses within a given HMA that "results in a [thriving natural ecological balance] and avoids a deterioration of the range." *Id.* The lower limit of the population range is "established at a number that allows the population to grow (at the annual population growth rate) to the upper limit over a 4-5 year period, without any interim gathers." *Id.*

26.    BLM may only modify an AML after "[a]n interdisciplinary and site-specific environmental analysis and decision process (NEPA) with public involvement," which is ordinarily done during the land-use planning process when amending the governing RMP. BLM Handbook at 18.

27.    Section 3 of the Wild Horse Act allows BLM to manage wild horses by removing "excess" animals from "a given area of the public lands," but only after BLM determines that: (1) "an overpopulation [of wild horses] exists on a given area of the public lands," and (2) "action is necessary to remove *excess* animals." 16 U.S.C. § 1333(b)(2) (emphasis added). The Wild Horse Act defines "excess" horses as those "which must be removed from any area in order

to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

28.    Once BLM makes an "excess determination," it may remove from public lands only those "excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(1); *see also id.* (BLM must use the wild horse inventories to "determine whether appropriate management levels should be achieved by the removal or destruction of excess animals."). According to BLM's own management handbook, "[w]ild horses or burros should generally *not be removed below the AML lower limit.*" BLM Manual 4720.2(21)(B) (emphasis added); BLM Handbook at 17 (wild horse removals should be conducted to "maintain population size within AML.").

29.    Removal of wild horses below low AML is warranted only when an adequate NEPA analysis subject to public participation indicates that "additional animals need to be removed to protect land health, wildlife habitat and the health of horses and burros remaining on the public land" or "in emergency situations based on limited forage, water, or other circumstances." BLM Manual 4720.2(21)-.2(22). In order for the agency to exercise its limited authority to remove horses below low AML, it must not only conduct "[a]n appropriate NEPA analysis and issuance of a decision . . . prior to removing the animals," but must also provide a compelling "[r]ationale to justify a reduction below the AML lower limit . . . [which] should include a discussion of the available forage, water and any other limiting factors." *Id.*

30.    In addition to the statutory authority to remove "excess" horses from the public lands, in Section 4 of the Wild Horse Act Congress provided BLM with the very limited authority to remove wild horses that "stray from public lands onto privately owned land," when

"the owners of such land . . . inform the nearest Federal marshall or [BLM agent]." 16 U.S.C. § 1334. This very narrow authority is triggered only by a "written request from the private landowner" that specifies "the numbers of wild horses or burros, the date(s) the animals were on the land, legal description of the private land, and any special conditions that should be considered in the gathering plan," 43 C.F.R. § 4720.2-1, at which point BLM must "arrange to have the animals removed." Even where Section 4 is properly invoked, this provision does not authorize BLM to remove any wild horses from public lands. Rather, in the absence of an "excess" determination, this provision only contemplates BLM removing wild horses from the "privately owned lands" and transferring them back to the "public lands" from which they "stray[ed]." 16 U.S.C. § 1334.

**B.    The National Environmental Policy Act**

31.    Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, to ensure that federal agencies consider and analyze: (1) the full environmental impacts of their actions before taking them, and (2) alternatives to proposed actions that may have less adverse impacts on the environment.

32.    NEPA requires all agencies to prepare an Environmental Impact Statement ("EIS") for major federal actions that may "significantly affect" the environment. 42 U.S.C § 4332(C); 40 C.F.R. § 1508.27. The "significance" determination "requires consideration of both context and intensity" and is based on several factors, such as: (1) "the degree to which the possible effects on the human environment are likely to be highly controversial," (2) whether the action will affect "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources," (3) whether the action establishes a "precedent for future actions with

16

significant effects," and (4) whether it "causes loss or destruction of significant 'scientific,

cultural, or historical resources.'" 40 C.F.R. § 1508.27(b).  If any of these factors are present,

the agency must prepare an EIS.

33.    To determine whether an EIS is required for a proposed action, an agency may

prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the

proposed action as well as reasonable alternatives to the proposed action.  *See* 40 C.F.R.

§§ 1501.4(c), 1508.9.  The EA must analyze both the "direct" impacts of the proposed action,

i.e., those that result directly from the management action, as well as the "indirect" impacts,

which include those caused by the action that are later in time but are "still reasonably

foreseeable." 40 C.F.R. § 1508.8(a)-(b).  The EA must also analyze cumulative effects.  *See* 40

C.F.R. § 1508(b).

34.    When an agency determines that an EIS is not required, it must issue a Finding of

No Significant Impact ("FONSI"), which must provide the reasons why the agency has

determined that its proposed action "will not have a significant impact" on the environment.  40

C.F.R. § 1508.13.

35.    As the Council on Environmental Quality's regulations implementing NEPA

explain, the alternatives analysis is "the heart of" the NEPA document.  40 C.F.R. § 1502.14.

The alternatives analysis must consider all reasonable alternatives and must "present the

environmental impacts of the proposal and the alternatives in comparative form, thus sharply

defining the issues and providing a clear basis for choice among options by the decisionmaker

and the public." *Id.*

C.     **Administrative Procedure Act**

36.     The APA provides for judicial review of agency action.  Under the APA, the reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A reviewing court must also set aside agency action, findings, and conclusions found to be without observance of procedure required by law.  *See id.* § 706(2)(D).

## FACTUAL BACKGROUND

A.     **The Adobe Town, Salt Wells Creek, and Great Divide Basin Herd Management Areas**

37.     The Adobe Town HMA is managed by BLM's Rawlins Field Office under the 2008 Rawlins Resource Management Plan ("Rawlins RMP").  The Adobe Town HMA consists of a patchwork of 417,916 acres of federal public lands and 30,000 acres of non-federal, mostly private lands located in Carbon and Sweetwater counties in southwest Wyoming.  The vast majority of the non-federal lands in the Adobe Town HMA are found in the northernmost portion of the HMA.  The northern portion of the Adobe Town HMA, which includes both public and private land, consists of a continuously alternating checkerboard pattern of federal parcels and private parcels of approximately one-mile by one-mile squares—i.e., each alternate parcel of land is only about one square mile in size.  The vast majority of this HMA consists of a large solid public land block without any private lands found therein.

38.     The 2008 Rawlins RMP, which was subject to public scrutiny through notice and comment procedures, established that BLM must "[m]aintain wild horse populations within the appropriate management levels (AML) of [any given] HMA" covered by the plan.  BLM,

18

Rawlins Resource Management Plan (Dec. 2008) at 2-51. As a result, the RMP requires that

BLM "[c]onduct regular, periodic gathers *when necessary to maintain AMLs*." *Id.* (emphasis

added). The Rawlins RMP set the operative AML for the Adobe Town HMA at 700 wild horses,

which is accomplished by an AML range of 610-800. *Id.*; *see also* BLM Wyoming Herd

Management Areas Map, *available at* http://www.blm.gov/pgdata/etc/medialib/blm/wy

/programs/wildhorses/maps.Par.8682.File.dat/hma.pdf.

     39.    The Salt Wells Creek HMA ("Salt Wells HMA") is managed by BLM's Rock

Springs Field Office under the 1997 Green River Resource Management Plan ("Green River

RMP"). The Salt Wells HMA consists of a patchwork of 690,400 acres of federal public lands

and 480,308 acres of non-federal, mostly private lands located in Carbon and Sweetwater

counties in southwest Wyoming. As in the northern portion of the Adobe Town HMA, the

public and private lands of the Salt Wells Creek HMA—located in the northern portion of the

HMA—are approximately one-mile by one-mile square plots that alternate continuously,

forming a checkerboard pattern. This HMA also contains a solid public land block outside of the

Checkerboard.

     40.    The Green River RMP established that BLM will manage wild horses "within five

Wild Horse Herd Management Areas," including the Salt Wells HMA. BLM, Green River

Resource Management Plan (Oct. 1997) at 23; Map 27. This RMP further requires that the

applicable AML, which was the product of NEPA review and public participation, be

"maintained among the five herd management areas" covered by the plan. *Id.* The Green River

RMP determined that the governing AML for the Salt Wells HMA is 251-365. *Id.* at 73, Table

15; *see also* BLM Wyoming Herd Management Areas Map, *available at* http://www.blm.gov

/pgdata/etc/medialib/blm/wy/programs/wildhorses/maps.Par.8682.File.dat/hma.pdf.

41.    The Great Divide Basin HMA is also managed by BLM's Rock Springs Field

Office under the Green River RMP.  The Great Divide Basin HMA encompasses a patchwork of

561,919 acres of federal public lands and 196,640 acres of private land located in Sweetwater

and Freemont counties in southwest Wyoming.  The southern portion of the Great Divide Basin

HMA consists of both public and private land in a continuously alternating checkerboard pattern

of federal parcels and private parcels of approximately one-mile by one-mile squares.  This

HMA also contains a large solid public land block outside of the Checkerboard.

42.    The Green River RMP determined that the appropriate AML for the Great Divide

Basin HMA is 415-600.   Green River RMP at 73, Table 15; *see also* BLM Wyoming Herd

Management Areas Map, *available at* http://www.blm.gov/pgdata/etc/medialib/blm/

wy/programs/wildhorses/maps.Par.8682.File.dat/hma.pdf.

43.    Parts of the Adobe Town, Salt Wells, and Great Divide Basin HMAs are included

within what is referred to as the "Wyoming Checkerboard" because of the alternating parcels of

public and private land.  Within these three HMAs, there are approximately 1,695,517 acres of

public lands and 731,703 acres of private lands, meaning that 70% of the lands in these HMAs

are public and only 30% are private.

44.    According to BLM, a private trade organization called the Rock Springs Grazing

Association ("RSGA") currently owns or controls approximately 731,703 acres of the

Checkerboard lands within the Adobe Town, Salt Wells, and Great Divide Basin HMAs, which

is 100% of the private lands in these HMAs.

**B.     The *RSGA* Litigation and the Resulting 2013 Consent Decree Between BLM and RSGA**

45.     On July 27, 2011, RSGA filed a complaint in the United States District Court for the District of Wyoming seeking to compel BLM to "remove all of the wild horses that have strayed onto the RSGA lands within the Wyoming Checkerboard." Complaint, *Rock Springs Grazing Ass'n v. Salazar* ("RSGA Case"), No. 2:11-cv-263935, F. Supp. 2d 1179 (D. Wyo. 2013), ECF No. 1. The Complaint explained that RSGA brought the case because it was informed by the Assistant Secretary for the Department of Interior that "litigation would be necessary to secure additional funding for wild horses gathers." *Id.* at ¶ 70.

46.     On November 11, 2011 the International Society for the Protection of Mustangs and Burros, AWHPC, and TCF (herein collectively referred to as the "AWHPC Intervenors"), were granted intervention in the *RSGA Case* in order to "'protect their aesthetic, recreational, educational, photographic, and other interests in protecting the wild horses that use the land' described as the Wyoming Checkerboard." Order Granting Motion to Intervene at 4, *RSGA Case*, ECF No. 32.

47.     On February 12, 2013, BLM and RSGA reached a settlement, and filed a Joint Motion to Dismiss and a Consent Decree. Joint Motion to Dismiss, *RSGA Case*, ECF No. 81; Proposed Consent Decree, ECF 81-1. The Consent Decree provided that: (a) BLM will "remove all wild horses located on RSGA's private lands, including Wyoming Checkerboard lands," Proposed Consent Decree ¶ 1, (b) "[i]f BLM determines, based on the results of any census and on projected reproduction rates, that the population in the Checkerboard lands is likely to exceed 200 wild horses for Salt Wells/Adobe Town Areas combined or 100 wild horses for Divide Basin, the BLM shall prepare to remove the wild horses from Checkerboard lands within the

21

respective area," *id.* ¶ 4, (c) "BLM will commit to gather and remove wild horses from Checkerboard lands within Salt Wells and Adobes Town HMAs in 2013, Divide Basin HMA in 2014, and White Mountain HMA in 2015, *id.* ¶ 5, and (d) "No later than 180 days after this Consent Decree is approved by the Court, BLM will submit to the Federal Register for publication a notice[s] of scoping under NEPA to . . . [c]hange the Salt Wells HMA to a Herd Area, which would be managed for zero wild horses . . .[c]hange the Divide Basin HMA to a Herd Area, which would be managed for zero wild horses . . . [c]hange the Adobe Town HMA AML to 224-450 wild horses or lower." *Id.* ¶ 6.

48.     In the Joint Motion to Dismiss, BLM and RSGA assured the Court that the Consent Decree promoted "the public interest by providing that *future decisions concerning the wild horse areas and numbers will occur through a public process*." Joint Motion to Dismiss, ECF No. 81 at ¶ 4 (emphasis added). The proposed Consent Decree even contained the following provision, presumably intended to protect the public interest:

> The RSGA recognizes that the Respondents are required to comply with other federal laws in conjunction with undertaking the required actions herein. *No provision of this Consent Decree shall be interpreted or constitute a commitment or requirement that the Respondents take actions in contravention of the WHA, FLPMA, NEPA, the APA, the Endangered Species Act, or any other law or regulation, either substantive or procedural.*

Proposed Consent Decree ¶ 17, ECF No. 81-1 (emphasis added). Paragraph 10 of the Consent Decree further explained that "[n]othing in this Consent Decree shall be construed to limit or modify the discretion accorded to BLM by the applicable federal law and regulations . . . or general principles of administrative law with respect to the procedures to be followed in carrying out any of the activities required herein, or as to the implementation or conduct of any of these activities." *Id.* at ¶ 10.

22

49.    The AWHPC Intervenor-Defendants objected to this proposed Consent Decree for several reasons. *See* Intervenor-Defendant Objections to Proposed Consent Decree, *RSGA Case*, ECF No. 86-1. One of the Intervenors' primary concerns was that, given the nature of the Checkerboard lands, there was simply no way to distinguish between horses on RSGA's private lands and those on public lands in the HMAs. *Id*. at 8. The AWHPC Intervenors explained that "absent more information about how this crucial determination [between horses on private and horses on public lands] will be made on any particular day, the agency's commitment 'to remove all wild horses located on RSGA's private lands, including Wyoming Checkerboard lands,' without complying with the laws that apply to decisions regarding the removal of any horses from public lands" adversely affected the Intervenor's rights and interest. *Id*. at 9.

50.    The AWHPC Intervenors also objected to the Consent Decree on the grounds that BLM was committing to remove wild horses from public land without making certain "statutorily required decisions" that "*cannot* be made without compliance with" the Wild Horse Act, NEPA, and other governing laws. *Id*. at 10-14. In particular, the Consent Decree appeared to require the removal of wild horses from public lands in situations that ignored BLM's statutory obligation under the Wild Horse Act to make an "excess" determination before conducting a roundup of only those wild horses deemed "excess" based on the operative AML in a given HMA. *Id*. at 10. Moreover, in the Consent Decree, BLM committed to take several agency actions that required compliance with NEPA—i.e., removing all wild horses from certain areas of public lands—before conducting the appropriate NEPA analysis, either an EA or EIS. *Id*. at 11-14.

23

51.     In response to the AWHPC Intervenor's objections, RSGA argued that:

Intervenors' objections to the Consent Decree focus in large part on how they speculate BLM will implement the future changes that BLM has agreed to consider.    The Intervenors' arguments contradict the plain language of the Consent Decree.    At this point, any objection as to implementation is premature . . . The premise that BLM will violate the law, long before any action has been taken, is not a basis to deny approval of the Consent Decree.

Reply of RSGA to Intervenors' Objections to Motion to Dismiss at 15-16, *RSGA Case*, ECF No. 89.  RSGA also emphasized that "BLM proposes to remove wild horses from RSGA lands and commits to follow the BLM NEPA and public comment procedures." *Id.* at 16.

52.     BLM also argued that AWHPC Intervenors' "legal objections to the Consent Decree are without support and are otherwise based on mischaracterizations of the clear terms of the proposed decree." Federal Respondents' Reply in Support of the Joint Motion to Dismiss at 7, ECF No. 88. BLM further argued that "[u]nder the proposed Consent Decree, the BLM *agrees only to consider* the aforementioned management alternatives and the potential environmental effect thereof *in resource manage plan revisions and associated NEPA documents.*" *Id.* at 8 (emphases added).

53.     On April 3, 2013, this Court approved the Consent Decree finding that it did not "on its face violate law or public policy." 935 F. Supp. 2d at 1191.  Focusing on paragraph 10 of the Consent Decree, the Court concluded that "the Consent Decree expressly prohibits any construction which would 'limit or modify the discretion accorded to BLM by the applicable federal law and regulations.'" *Id.* at 1189.  Rather than addressing the merits of the Intervenors' objections, the Court instead held that "whether the Consent Decree actually limits the BLM's discretion will turn on the implementation and force of the Decree, which is unclear at this junction." *Id.* at 1189-90.  In turn, the Court concluded "that the Consent Decree is not

inconsistent on its face with the resource management or NEPA processes, and Intervenors' arguments on this point are not ripe for adjudication." *Id.* at 1190.

### C.    BLM's 2013 Decision Record in the Adobe Town and Salt Wells HMAs

54.    The RSGA Consent Decree states that "BLM will commit to gather and remove wild horses from Checkerboard lands within Salt Wells and Adobe Town HMAs in 2013." Consent Decree ¶ 5, ECF No. 81-1. As a result, in July 2013, BLM issued Decision Record ("2013 Decision Record") and EA for two agency actions: (1) the removal of "excess" wild horses from the public lands of the Adobe Town and Salt Wells HMAs pursuant to Section 3 of the Wild Horse Act, and (2) the removal from private lands of all wild horses that had strayed onto private checkerboard lands within the Adobe Town and Salt Wells HMAs pursuant to Section 4 of the Act.

55.    In its 2013 Decision Record, BLM made an explicit "excess" determination as required by Section 3 of the Wild Horse Act. BLM identified the applicable AML for both the Adobe Town HMA (610-800 wild horses) and the Salt Wells HMA (251-365 wild horses) as determined—through the public decisionmaking process—in the Rawlins RMP and the Green River RMP. BLM then compared the projected wild horse inventory of 624 wild horses in Adobe Town and 823 wild horses in Salt Wells Creek to the operative AMLs. Based on this information, BLM made a specific determination that there were 14 "excess" wild horses in the Adobe Town HMA and 572 "excess" wild horses in the Salt Wells Creek HMA.

56.    Wild horse advocacy organizations (including Petitioners in this case) were initially concerned that BLM's 2013 decision to (a) remove all "excess" horses in the Adobe Town and Salt Wells HMAs, and (b) remove all horses from private checkerboard lands within

these two HMAs would result in bringing the wild horse populations in these areas to below

AML. However, BLM assured those organizations in a formal letter, through counsel, that the

"wild horses will be removed from private lands (including the checkerboard lands) and the

population *will be maintained at the low AML within the federal land block*."

57.    In November 2013, pursuant to its EA and FONSI, BLM rounded up 668 wild

horses from the Adobe Town and Salt Wells HMAs. BLM permanently removed 586 of those

wild horses from the range, which was the combined number of horses determined by BLM in

the 2013 EA to constitute "excess" wild horses relative to the prescribed AMLs. The remaining

79 wild horses rounded up from the checkerboard lands were released back into the federal land

blocks of these HMAs in order to stay within the operative AML in the Adobe Town and Salt

Wells HMAs. For reasons that BLM has never explained to the public, BLM did not fully

execute the 2013 gather as authorized in its Decision Record and EA; to the contrary, BLM

stopped gathering horses when it reached a certain number of horses, thereby leaving some wild

horses on the private lands of the Checkerboard. As a result, BLM did not fully respond to

RSGA's Section 4 request.

### D.    BLM's Scoping for a 2014 Roundup in the Great Divide Basin HMA

58.    The RSGA Consent Decree states that "BLM will commit to gather and remove

wild horses from Checkerboard lands within . . . [the] Great Divide Basin HMA in 2014."

Consent Decree at ¶ 5. As a result, on December 6, 2013, BLM began the NEPA process for the

Great Divide Basin HMA by issuing a Scoping Statement for a proposed roundup of "excess"

wild horses and for removal of all wild horses on the private Checkerboard lands within the

HMA. This statement identified the low AML for the Great Divide Basin HMA (415 wild

horses) and made clear that, while all wild horses would be removed from private land, some "may be relocated in the northern part of the Great Divide Basin HMA" to maintain the low AML within the HMA. *Id.* BLM's scoping statement mirrored the approach undertaken by BLM in its 2013 roundup in the Adobe Town and Salt Wells HMAs.

59.    In response to this scoping statement, RSGA submitted comments that "identified concerns with BLM's proposed action to remove wild horses to the low appropriate management level for the HMA, as this was believed to be inconsistent with the 2013 Consent Decree provision for removing *all wild horses from checkerboard lands*." In other words, RSGA objected to BLM's failure to remove all wild horses from RSGA's private lands, as BLM had committed to doing in the 2013 Decision Record. As a result, BLM decided not to "gather the Great Divide Basin HMA to low appropriate management level under Section 3 of the WHA" but instead to "gather all wild horses from the checkerboard within the HMAs as required by Section 4 of the WHA and the Consent Decree." In turn, BLM abandoned the NEPA process concerning a roundup of excess wild horses in the Great Divide Basin HMA.

**E.    BLM's 2014 Decision to Remove All Wild Horses From the Public and Private Checkerboard Lands within the Great Divide Basin, Salt Wells, and Adobe Town HMAs**

60.    On July 18, 2014, BLM issued a Decision Record ("2014 Decision Record") and a Categorical Exclusion ("CE") authorizing the "removal of all wild horses from Checkerboard Lands within the Great Divide Basin, Adobe Town, and Salt Wells Creek Herd Management Areas." BLM based that decision only on its authority under Section 4 of the Wild Horse Act, which only applies to private lands. *See* 16 U.S.C. § 1334. BLM made clear in its 2014 Decision Record that the removal would not just occur on private lands within the Checkerboard; rather

27

BLM "acknowledge[d] that in discharging its duties under Section 4 of the WHA wild horses *will also be removed from the public land* portions of the Checkerboard." However, BLM never made any specific determination that the wild horses found on public lands constituted "excess" horses, as is required by Section 3 of the Wild Horse Act before any wild horse can be permanently removed from public lands.

61.     BLM did not prepare an EA or an EIS before issuing the 2014 Decision Record. Rather, BLM invoked a categorical exclusion that allows for the "[r]emoval of wild horses or burros *from private lands* at the request of the landowner." Neither the CE nor the Decision Record identified, let alone discussed, the operative AMLs for the Great Divide Basin, Salt Wells, or Adobe Town HMAs. BLM's 2014 Decision Record indicated that the agency would remove so many horses that the decision would bring those populations to below the binding AMLs established in the governing RMPs.

### E.     Petitioners' Lawsuit Concerning BLM's 2014 Decision Record

62.     Petitioners filed a Petition for Review with this Court challenging BLM's 2014 Decision Record on Wild Horse Act, FLPMA, and NEPA grounds. *See Am. Wild Horse Preservation Campaign v. Jewell*, No. 14-cv-152 (D. Wyo.) (Freudenthal, J.). After denying Petitioners' request for preliminary injunctive relief, BLM proceeded with rounding up and permanently removing 1,263 wild horses from the public and private lands of the Wyoming Checkerboard. That action left all three HMAs far below their governing AMLs.

63.     The Court issued a merits ruling in March 2015. In that ruling, the district court rejected Federal Respondents' mootness argument and determined that Petitioners' claims present a live controversy because of the court's ability to order BLM to return horses to the

range or to compel BLM to comply with various statutory procedures. *See* ECF No. 83 at 12-14.

On the merits, the Court ruled for Respondents on the Wild Horse Act and FLPMA claims, and

ruled for Petitioners as to the NEPA claim. *See id.* at 14-27.

64.     With respect to the Wild Horse Act claim, the Court held that BLM's

unprecedented action of treating public lands as private lands for purposes of managing wild

horses on the Wyoming Checkerboard was a permissible construction of the statute under

*Chevron* Step 2.  Likewise, as to FLPMA, although the Court acknowledged that BLM's

decision "had the practical effect of reducing horse populations far below the binding AML

requirements of the operative RMPs," the Court affirmed BLM's action on the ground that BLM

only invoked its Section 4 private land removal authority for this action to which AMLs do not

apply, without reconciling the fact that BLM *also* permanently removed hundreds of wild horses

from *public* lands to which these AMLs *do* expressly apply under the binding RMPs.  ECF No.

83 at 21-23.

65.     Under NEPA, although this Court found that BLM did not act arbitrarily in

categorically excluding this action from NEPA review on the grounds that BLM only invoked

Section 4 of the Wild Horse Act in taking this action (despite the fact that it involved the removal

of hundreds of horses from *public* land), the Court nevertheless found that BLM contravened

NEPA by failing to adequately consider reasonable alternatives to the action.  ECF No. 83 at 23-

27.  Specifically, the Court noted that in its NEPA analysis, BLM should have looked at

reasonable alternatives involving BLM's discretion to return at least *some* horses to the public

land blocks outside of the Checkerboard.  *See id.* at 26 ("There is nothing in the record to suggest

that BLM had no discretion for the return of any horse.")  Thus, the Court remanded the NEPA

analysis to BLM to address those deficiencies. *Id.* at 27.  Respondents did not appeal the adverse

NEPA ruling.

**F.      Petitioners' Pending Appeal Before the U.S. Court of Appeals for the
<u>Tenth Circuit</u>**

66.      On May 13, 2015, this Court granted Petitioners' motion for entry of final

judgment, and on May 14, 2015, entered final judgment for Respondents. *See* ECF No. 95.

Plaintiffs filed a timely notice of appeal on May 18, 2015. *See* ECF No. 96.

67.      On appeal, the parties have fully briefed the serious and important legal issues of

first impression to the Tenth Circuit—namely, whether Congress authorized BLM to

permanently remove wild horses from *public* land using its limited Section 4 authority pertaining

only to private land, and in the process whether BLM may ignore clear-cut statutory dictates that

*do* apply to public lands under Section 3 of the Wild Horse Act and FLPMA.  In addition, the

Tenth Circuit held oral argument on September 19, 2016, meaning that a ruling is expected in the

near future that will have a dispositive effect on whether BLM may lawfully remove any wild

horses from public lands pursuant only to its Section 4 authority in the Wild Horse Act and in

deviation of the binding AMLs developed pursuant to FLPMA.

**G.      <u>BLM's 2016 Wyoming Checkerboard Decision Record and EA</u>**

68.      Despite the pending appeal which will have a direct and dispositive bearing on the

legality of BLM's removal of wild horses from public lands under its Section 4 authority, BLM

issued a new Decision Record on September 16, 2016—one business day before oral arguments

took place in the U.S. Court of Appeals for the Tenth Circuit—again authorizing the removal of

all wild horses from the public and private Checkerboard lands in the Adobe Town, Salt Wells

Creek, and Great Divide Basin HMAs based only upon BLM's limited authority in Section 4 of

the Wild Horse Act. BLM acknowledged that this action—as occurred with the 2014 removal—

will likely take these wild horse population below their binding AMLs that apply to all of the

public lands of these HMAs. In the Decision Record, BLM indicated that it "currently plans to

commence with the removal after October 16, 2016."

69.     BLM based its September 2016 Decision Record in part on its Final EA analyzing

the Checkerboard Removal. Although various public commenters had specifically requested that

BLM thoroughly consider the most obvious alternative that could harmonize both Sections 3 and

4 of the Wild Horse Act—i.e., rounding up all wild horses from the public and private

Checkerboard lands in these HMAs pursuant to both statutory provisions, and then returning to

the solid public lands blocks outside of the Checkerboard only the minimum number of horses

necessary to comply with the binding AMLs established in the governing RMPs—BLM refused

to consider that alternative in any detail. To the contrary, BLM eliminated this alternative from

analysis based on the mistaken premise that the requested alternative "would be similar to the

2013 wild horse removal that BLM completed for two of these HMAs" in which "BLM gathered

wild horses on the Checkerboard until it dropped slightly below AML for the HMAs, and then

stopped gathering wild horses in the Checkerboard. . . . [thus,] [t]his approach left wild horses in

the Checkerboard." But public commenters never requested that in harmonizing Sections 3 and

4 of the Wild Horse Act BLM should leave any horses on RSGA's private lands (as occurred

when BLM improperly executed the 2013 Decision Record); in contrast, public commenters

asked BLM to thoroughly evaluate an alternative in which BLM rounds up *all* horses from the

Checkerboard's public and private lands (thereby fully satisfying RSGA's pending Section 4

request) while returning those necessary to public lands *outside* the Checkerboard to comply

31

with the AMLs that apply to these HMAs (thereby satisfying Section 3 of the Wild Horse Act and FLPMA). The alternative advanced by Petitioners and other members of the public—and disregarded by BLM in its Final EA—is also consistent with this Court's merits ruling concerning the 2014 Decision Record in which the Court instructed BLM to fully analyze reasonable alternatives that would include BLM exercising its discretion to return some horses to the range outside of the Checkerboard in these HMAs.

**H.    Petitioners' Request for BLM to Temporarily Postpone Implementation of the 2016 Decision Record until the Tenth Circuit Issues its Ruling**

70.    On September 29, 2016, Petitioners' counsel sent a formal request to BLM asking BLM to temporarily postpone implementation of the September 16, 2016 Decision Record in order to provide sufficient time for the Tenth Circuit to issue a ruling in case number 15-8033 (i.e., the pending appeal concerning BLM's 2014 Decision Record). Because that appeal has been fully briefed and argued, and because the Tenth Circuit's imminent ruling will determine BLM's legal authority to undertake the activities described in BLM's 2016 Decision Record, Petitioners explained in their request that "it would benefit all stakeholders involved for BLM to voluntarily agree to a temporary postponement of these activities until the Tenth Circuit can issue its decision." Through counsel, BLM responded on September 30, 2016, indicating that BLM is not willing to temporarily postpone implementation of the 2016 Decision Record until the Tenth Circuit issues its ruling in the pending appeal. Thus, BLM indicated that it will begin implementing the 2016 Decision Record on October 16, 2016 by permanently removing all wild horses from the public and private lands of the Wyoming Checkerboard located in these HMAs.

## PETITIONERS' CLAIMS FOR RELIEF

### Claim 1 – Wild Horse Act Violations

71.     Petitioners hereby incorporate Paragraphs 1-70 by reference.

72.     BLM has authorized the permanent removal of approximately 500 wild horses

from public lands allocated to wild horse use and management in the Adobe Town, Salt Wells,

and Great Divide Basin HMAs, but failed to first make the legally required "excess"

determination, which is a mandatory prerequisite under Section 3 of the Wild Horse Act before

*any* horses can be permanently removed from the range. Section 4 of the Wild Horse Act does

not grant BLM any authority to permanently remove wild horses from any public lands. Only

Section 3 of the Wild Horse Act grants BLM the authority to permanently remove horses from

public lands, but even that authority is limited to the removal of "excess" wild horses as defined

by the Act. BLM's failure to make that congressionally mandated "excess" determination before

authorizing the permanent removal of hundreds of wild horses from public lands violates the

Wild Horse Act, 16 U.S.C. § 1333(b)(2), its implementing regulations, *see* 43 C.F.R. § 4720.1,

BLM's own governing directives and longstanding policy and practice, *see* BLM Manual

4720.1, and the APA, 5 U.S.C. § 706(2).

73.     Because BLM did not make the statutorily required "excess" determination, the

agency has authorized an action that will result in the wild horse populations in these HMAs

going below the long-established low AMLs. BLM failed to disclose or acknowledge (much less

analyze) the governing AMLs in each of the HMAs at issue and how the wild horse population

numbers in these HMAs would be affected by its decision. BLM did not provide—or even

purport to provide—any evidence that an emergency situation exists necessitating wild horse

populations in these HMAs being below AML (as defined by BLM's wild horse manual). Nor
has BLM completed any public process under FLPMA and NEPA to formally change the
boundaries of these public land HMAs or reduce the operative AMLs that apply to the public
lands of these HMAs, which is the only legal mechanism for doing so. Therefore, in the absence
of any legally adequate rationale, BLM's decision—which will bring the wild horse populations
below the governing AMLs—violates the Wild Horse Act, 16 U.S.C. § 1333(b)(1), BLM's own
governing directives and longstanding policy and practice, *see* BLM Manual 4720.22(B); BLM
Handbook at 18, and the APA, 5 U.S.C. § 706(2).

74.    There are far less drastic alternatives to *permanently* removing from the range *all*
wild horses that are currently using the public and private lands of the Checkerboard. For
example, BLM could adopt a management approach consistent with the 2013 Decision Record—
although BLM failed to carry out that approach in practice when implementing the decision—
whereby BLM complies with *both* Sections 3 and 4 of the Wild Horse Act and achieves the
AML on the solid public land blocks outside the Checkerboard while also removing *all* horses
from RSGA's private lands, as described herein. By refusing to even consider alternatives such
as this one that could harmonize all of the statutory provisions at issue, and by instead selecting
the most invasive of all management options that strips several statutory provisions of any
meaning, BLM's authorization of permanent removal of all wild horses found on the
Checkerboard's public lands violates the Wild Horse Act's requirement that "[a]ll management
activities [related to wild horses] shall be at the *minimal feasible level*," 16 U.S.C. § 1333(a), and
the APA, 5 U.S.C. § 706(2).

75.    For all of the reasons set forth in paragraphs 71-74, BLM's decision violates the Wild Horse Act and its implementing regulations, and is arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. § 706(2).   Petitioners are harmed by these violations in the manner described in paragraphs 6-18.

### Claim 2 – Violations of the 1997 Green River RMP and the 2008 Rawlins RMP, FLPMA, and the APA

76.    Petitioners hereby incorporate Paragraphs 1-70 by reference.

77.    BLM has authorized the permanent removal of wild horses at levels that will take those wild horse populations significantly below the applicable AMLs that apply to all public lands within these HMAs, which were established in the governing RMPs after an extensive notice-and-comment decisionmaking process pursuant to FLPMA.   BLM's cursory decision documents do not provide any legally adequate explanation for the agency's stark departure in this Decision Record from its own prescribed AMLs that apply to the public lands of these HMAs as established by the governing RMPs.   Nor does BLM provide any explanation for how it can *de facto* modify its AMLs in these HMAs outside of the FLPMA and NEPA processes that are legally required for such modifications.   BLM has failed to adhere to its own binding RMPs and has not provided any explanation to justify this departure.   As a result, BLM's decision violates the agency's own 1997 Green River RMP and 2008 Rawlins RMP, *see* Green River RMP at 23, 73, Table 15; Rawlins RMP at 2-51, FLPMA, *see* 43 U.S.C. § 1701(a)(2), FLPMA's implementing regulations, *see* 43 C.F.R. §§ 4710.1, 1601.0-2, BLM's own governing directives and longstanding policy and practice, and, *see* BLM Handbook at 18, and the APA, 5 U.S.C. § 706(2).   Petitioners are harmed by these violations in the manner described in paragraphs 6-18.

**Claim 3 – NEPA Violations**

78.    Petitioners hereby incorporate Paragraphs 1-70 by reference

79.    In authorizing the permanent removal from the range of approximately 500 wild

horses—including hundreds from public lands allocated by the governing RMPs to wild horse

use and management—BLM failed to consider reasonable alternatives urged by members of the

public that, unlike the selected action, would harmonize Sections 3 and 4 of the Wild Horse Act

and ensure legal compliance with the binding AMLs.  By failing even to consider this option in

detail—and, instead, mistakenly assuming that this approach would not remove all horses from

the Checkerboard's private lands and therefore not respond to RSGA's pending request—BLM

violated a key feature of NEPA requiring all federal agencies to extensively consider all

reasonable alternatives before issuing a decision with environmental effects.  For this reason,

BLM's Decision Record, Final EA, and FONSI violate NEPA, 42 U.S.C § 4332(C), its

implementing regulations, *see* 40 C.F.R. § 1502.14, and the APA, 5 U.S.C. § 706(2).  Petitioners

are harmed by these violations in the manner described in paragraphs 6-18.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners respectfully request that the Court enter an Order:

1.    Declaring that Federal Respondents have violated the Wild Free-Roaming

Horses and Burros Act, the Federal Land Policy and Management Act, the National

Environmental Policy Act, and the Administrative Procedure Act;

2.    Setting aside Federal Respondents' September 16, 2016 Decision Record,

Final EA, and Finding of No Significant Impact, and remanding the matter to BLM to comply

with governing laws before taking any further action;

3.      Enjoining Federal Respondents from taking any further actions to round up and remove any wild horses from the public lands of the Adobe Town, Salt Wells, and Great Divide Basin HMAs, until they have fully complied with governing laws;

4.      Prohibiting Federal Respondents from permanently removing any wild horses from the public lands of the Adobe Town, Salt Wells, and Great Divide Basin HMAs not determined to be "excess";

5.      Awarding Petitioners their attorneys' fees and costs in this action; and

6.      Granting Petitioners any further relief as the Court may deem just and proper.

Respectfully submitted,

Timothy Kingston (WY Bar No. 5-2476)
LAW OFFICE OF TIM KINGSTON, LLC
620 East 27th
Cheyenne, WY 82001
(307) 638-8885 / (307) 637-4850 (fax)

William S. Eubanks II
(D.C. Bar No. 987036)
MEYER GLITZENSTEIN & EUBANKS LLP
245 Cajetan Street
Fort Collins, CO 80524
(970) 703-6060 / (202) 588-5049 (fax)
beubanks@meyerglitz.com

William N. Lawton
(Oregon Bar No. 143685)
MEYER GLITZENSTEIN & EUBANKS LLP

4115 Wisconsin Ave, NW, Suite 210
Washington DC, 20016
(202) 588-5206 / (202) 588-5049 (fax)
nlawton@meyerglitz.com

Date: October 3, 2016                    Counsel for Petitioners